UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ALTANA PHARMA AG and WYETH, <br><br> Plaintiffs, <br><br> v. <br><br> TEVA PHARMACEUTICALS USA, INC., et al., <br><br> Defendants. | Civil Action No. 04-2355 (JLL) <br><br> **OPINION** |

**LINARES,** District Judge.

This matter comes before the Court by way of Defendants Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries, Ltd. (collectively "Teva")'s motion to exclude (1) Dr. Christopher Vellturo's expert opinions on damages resulting from price erosion, reasonable royalties, and lost profits and lost royalties pursuant to Fed. R. Evid. 702 and 403 and (2) Dr. Jeffrey Leitzinger's opinions regarding the extent to which Defendants Sun Pharmaceutical Industries, Ltd, Sun Pharmaceutical Advanced Researched Centre, Ltd., and Sun Pharma Global, Inc. (collectively "Sun") are liable to Plaintiffs for lost profits resulting from lost sales of branded Protonix pursuant to Fed. R. Evid. 702 and 403. The Court has considered the submissions made in support of and in opposition to Teva's motion, and decides this matter without oral argument pursuant to Fed. R. Civ. P. 78. For the reasons set forth below, Teva's motion is granted in part and denied in part.

1

I.  **BACKGROUND**

Because the Court has extensively set forth the facts of this case in numerous summary judgment opinions, only those facts specifically pertinent to the instant motion are discussed below.

A.  Dr. Vellturo's Damages Opinions

Dr. Vellturo—an economist—is Plaintiff Nycomed and Wyeth (collectively "Plaintiffs")'s damages expert. In Dr. Vellturo's expert opinion, the damages adequate to compensate Plaintiffs for Defendants' infringement are (1) lost profits on sales lost to Defendants' infringing products (lost royalties in Nycomed's case); (2) lost profit damages resulting from price erosion on Plaintiffs' retained sales; and (3) a reasonable royalty on any infringing sales made due to increased demand for pantoprazole resulting from lower average prices. Alternatively, Dr. Vellturo opines that in the event that the jury finds that Plaintiffs are not entitled to lost profits on lost sales, they are entitled to a reasonable royalty applied to all of Defendants' sales.

Dr. Vellturo is expected to testify that the damages adequate to compensate Plaintiffs total $2.772 billion with pre-judgment interest totaling $229.4 million. (CM/ECF No. 1313-2 at 370, ¶ 12.) This amount includes lost profits on lost sales of pantoprazole tablets, as well as price erosion on sales Plaintiffs retained in the face of infringement. (*See id.*) Alternatively, Dr. Vellturo has opined that if the jury were to determine that damages for lost sales should be awarded based solely on a reasonable royalty, Plaintiffs' damages should total $2.431 billion, with prejudgment interest totaling $168.1 million. (*Id.* ¶ 13.)

B.  Dr. Leitzinger's Opinions Regarding the Extent to which Sun is Liable to Plaintiffs for Lost Profit Damages on Lost Sales of Protonix

Dr. Leitzinger is an economist whom Sun asked to review Dr. Vellturo's opinions

2

regarding Plaintiffs' entitlement to lost profits as a result of Sun's infringement of the '579 patent. In Dr. Leitzinger's opinion, "Dr. Vellturo's calculation of lost profit damages attributable to Sun fundamentally errs in its failure to properly assess losses that were reasonably caused by Sun's infringement." (CM/ECF No. 1274-4 at 4, ¶ 7.) Specifically, Dr. Leitzinger opines that Dr. Vellturo's analysis is flawed because it ignores that Teva's infringing generic and Wyeth's own generic were already in the marketplace at the time that Sun launched its product. (*Id.* at 9, ¶ 72.) Consequently, Dr. Leitzinger opines that the lost profits Dr. Vellturo "attributes to Sun are vastly overstated." (*Id.* at 4, ¶ 7.) Additionally, Dr. Leitzinger asserts that "Dr. Vellturo's calculations of overall lost profit amounts . . . are based upon inflated projections of Protonix sales volumes and prices that would have existed but for infringement." (*Id.* at 4-5, ¶ 7.)

## II. LEGAL STANDARD

### A. General Standard for Deciding Motions *In Limine*[1]

District Courts have broad discretion "in determining the admissibility of evidence under the Federal Rules." *See United States v. Abel*, 469 U.S. 45, 54 (1984). Courts may exercise this discretion to rule on motions *in limine* "to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions." *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1069 (3d Cir. 1990). It is generally appropriate, however, for courts to reserve judgment on a motion *in limine* until trial. *See, e.g., Kraemer v. Franklin & Marshall College*, No. 95-0020, 1995 U.S. Dist. LEXIS 17093, at *3-4 (E.D. Pa. Nov. 15, 1995) ("The Court declines to rule on whether to exclude . . . testimony before it has been placed into a specific context at trial."); *see also Hawthorne Partners v. AT&T Technologies, Inc.*, 831 F. Supp. 1398, 1400 (N.D. Ill. 1993)

---

[1] Under Federal Circuit precedent, regional circuit law governs evidentiary questions. *See, e.g., Meyer Intellectual Props. Ltd. v. Bodum, Inc.*, 690 F.3d 1354, 1371 (Fed. Cir. 2012) ("We review the district court's decision to exclude evidence under the law of the relevant circuit."). Accordingly, Third Circuit precedent guides this Court's evidentiary determinations.

3

("This court has the power to exclude evidence in limine only when evidence is clearly inadmissible on all potential grounds").

B. Standard for Admissibility of Expert Testimony

The admissibility of expert testimony is governed by Fed. R. Evid. 702, which provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) The testimony is based on sufficient facts or data;
>
> (c) The testimony is the product of reliable principles and methods; and
>
> (d) The expert has reliably applied the principles and methods to the facts of the case.

The Third Circuit has held that Rule 702 "embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (citations omitted). To satisfy the qualification requirement, a witness must "possess specialized expertise." *Id.* at 404. This requirement is interpreted liberally; "a broad range of knowledge, skills, and training qualify an expert as such." *In re Paoli R.R. Yard Pcb Litig.*, 35 F.3d 717, 741 (3d Cir. 1994). To be reliable, there must be a "link between the facts [underlying the expert's opinion] and the conclusion." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 291 (3d Cir. 2012); *see also Kumho Tire*, 526 U.S. 137, 157 (1999) (observing that courts are not required "to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert") (internal citations omitted). Finally, the question as to whether an expert's proffered

testimony is a fit is one of relevance that requires the court to determine whether the proffered testimony "will aid the jury in resolving a factual dispute." *See Lauria v. AMTRAK*, 145 F.3d 593, 599-600 (3d Cir. 1998) (quoting *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 591 (1993)).

It is well settled that district courts must serve a "gatekeeping function" to ensure that an expert's testimony satisfies the requirements of Rule 702. *See, e.g., Daubert*, 509 U.S. at 592-95; *Kumho Tire Co.*, 526 U.S. at 141. In performing this function, courts must be mindful that Rule 702 "has a liberal policy of admissibility." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008). Indeed, the Third Circuit has observed that the standard for admissibility "is not intended to be a high one." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000). The proponent of expert testimony need not prove that its expert is correct, but that the expert's "opinion is based on valid reasoning and a reliable methodology." *Id.* at 146. "The analysis of conclusions themselves is for the trier of fact when the expert is subject to cross-examination." *Id.*; *see also ZF Meritor*, 696 F.3d at 290 (holding that mere existence of evidence in the record that contradicted expert's conclusion was no basis to exclude expert's testimony).

C. Standard for Exclusion of Testimony under Rule 403

Even if relevant, expert testimony may be excluded under Rule 403. *See, e.g., Daubert*, 509 U.S. at 595. Rule 403 allows district courts to exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "Pretrial Rule 403 exclusions should rarely be granted." *In re Paoli R. Yard PCB Litig.*, 916 F.2d 829, 859-60 (3d Cir. 1990) ("In sum, we hold that in order to exclude evidence under Rule 403 at the pretrial stage, a court must have a record

5

complete enough on the point at issue to be considered a virtual surrogate for a trial record.").
*Id.* at 859.

**III. DISCUSSION**

The Court will now turn to the merits of Teva's motion seeking to exclude (1) Dr. Vellturo's opinions on damages resulting from price erosion, lost profits and lost royalties and (2) Dr. Jeffrey Leitzinger's opinions regarding the extent to which Sun is liable to Plaintiffs for lost profits resulting from lost sales of branded Protonix.

    1.    <u>Teva's Motion as to Dr. Vellturo</u>

Teva argues that Dr. Vellturo's opinions on price erosion and reasonable royalties must be excluded because his analyses underlying these opinions are unreliable. Teva also maintains that Dr. Vellturo should be precluded from opining on Nycomed's lost profits on lost sales in light of this Court's summary judgment opinion and order barring Nycomed from recovering such lost profits. Finally, Teva argues that Dr. Vellturo should be precluded from offering an opinion on lost royalties on the ground that he has neither offered an opinion on such damages nor disclosed a lost-royalties theory of damages in discovery. The Court will now proceed to address the extent to which it should preclude Dr. Vellturo from opining on price erosion; reasonable royalties; and lost profits and lost royalties.

    a.    <u>Admissibility of Dr. Vellturo's Opinion on Price Erosion</u>

Teva maintains that Dr. Vellturo's opinion on price erosion must be excluded because his opinion is based on flawed analysis. Specifically, Teva takes issue with the methodology that led Dr. Vellturo to conclude that "significant price erosion" resulted from the entry of generic pantoprazole into the market. (*See* CM/ECF No. 1271 at 9.) Dr. Vellturo reached this conclusion after comparing the average forecasted price at which Wyeth would have sold

Protonix and its own generic had Teva and Sun not entered the market, to the average realized price at which Wyeth sold these products during the infringement period.

According to Teva, Dr. Vellturo's analysis fails to show that Wyeth actually reduced prices on branded Protonix and its own generic in response to competition from the infringing generics "because a drop in average price may be due to the loss of sales to certain categories of customers [who paid higher prices] and not due to price reductions." (CM/ECF No. 1271 at 10-11.) Teva also claims that Dr. Vellturo's analysis fails to establish that the decrease in the average price of pantoprazole and of Wyeth's own generic was a result of generic competition and not some other market factor.[2]

Teva's arguments fail to persuade this Court to exclude Dr. Vellturo's opinion on price erosion. Indeed, this Court is satisfied that there is a logical link between Dr. Vellturo's observation that the there was a reduction in the average price of Protonix and Wyeth's own generic during the infringement period on the one hand, and his opinion that this price reduction was a result of the entry of Defendants' generic on the other. Teva's arguments questioning Dr. Vellturo's methodology and the conclusions he reached may ultimately persuade a jury not to credit his price erosion opinion; they do not, however, offer compelling reasons for excluding this opinion entirely. *See, e.g., Oddi*, 234 F.3d at 145; *see also Voilas v. General Motors Corp.*, 73 F. Supp. 2d 452, 461-62 (D.N.J. 1999) ("[T]he perceived flaws in an expert's testimony often should be treated as matters properly to be tested in the crucible of the adversarial system, not as the basis for truncating that process.") (citations and internal quotation marks omitted); *Wicker v. CONRAIL*, 371 F. Supp. 2d 702, 712 (W.D. Pa. 2005) ("[A] flaw in methodology does not automatically disqualify an expert opinion") (citing *Paoli*, 35 F.3d at 746).

---

[2] Under Federal Circuit precedent, a patentee must "establish the amount of price reduction, and that the price was reduced in response to the competing bid" to recover price erosion damages. *See, e.g., Vulcan Eng'g Co. v. Fata Aluminum, Inc.*, 278 F.3d 1366, 1377 (Fed. Cir. 2002).

7

b.   Admissibility of Dr. Vellturo's Opinion on Reasonable Royalty

There is no dispute that the minimum amount of damages to which Plaintiffs are entitled is a reasonable royalty. *See* 35 U.S.C. § 284; *Bandag, Inc. v. Gerrard Tire Co.*, 704 F.2d 1578, 1583 (Fed. Cir. 1983) ("A reasonable royalty . . . is . . . the floor below which damages shall not fall."). Dr. Vellturo reached an opinion on reasonable royalties by considering the 15 factors set forth in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970) for determining such royalties. Notably, in his report, Dr. Vellturo explains in painstaking detail how he went about applying each of the 15 *Georgia-Pacific* factors.[3] (*See* CM/ECF No. 1316-2

---

[3] The 15 *Georgia-Pacific* factors are:

1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.
2. The rates paid by the licensee for the use of other patents comparable to the patent in suit.
3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.
4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve the monopoly.
5. The commercial relationship between the licensor and the licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promotor;
6. The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.
7. The duration of the patent and the term of the license.
8. The established profitability of the product made under patent; its commercial success; and its current popularity.
9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.
10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.
11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.
12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.
13. The portion of realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.
14. The opinion testimony of qualified experts.
15. The amount that a licensor (such as a patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee – who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been

8

at 81-102.) The focus of Dr. Vellturo's analysis involved calculating "the likely royalty rate that Plaintiffs and Teva and Plaintiffs and Sun would have agreed upon for a license to the '579 patent" had they negotiated for such a license at the time of the initial infringement. (CM/ECF No. 1316-2 at 81, ¶ 95.)

Teva argues that Dr. Vellturo's opinion on reasonable royalties is unreliable and, therefore, inadmissible for the following reasons: (1) his hypothetical negotiation framework departs from the facts of this case; (2) he abandons the "willing licensee / willing licensor" hypothetical negotiation framework set forth in *Georgia-Pacific* by constructing a hypothetical negotiation whose terms are overly favorable to Plaintiffs; (3) his conclusion that the reasonable royalty for expansion sales must be equal to Plaintiffs' lost profits of $1.85 per tablet is flawed because it gives Plaintiffs their full profit margin on sales that would not have occurred absent infringement; and (4) his reasonable royalty analysis ignores all prior license agreements for patent rights to pantoprazole. (*See* CM/ECF No. 1271 at 19-43.) The Court will proceed to address each of these arguments, in turn.

    i.    <u>Dr. Vellturo's Hypothetical Negotiation Framework</u>

According to Teva, Dr. Vellturo's hypothetical negotiation framework departs from the facts of this case in three ways. *First*, Teva maintains that Dr. Vellturo "does not model reasonable royalty based on" Teva's actual use of the invention (i.e., the manufacture and sale of generic pantoprazole), but on a hypothetical agreement whereby Plaintiffs would have licensed Teva "to manufacture and sell branded Protonix under contract for Plaintiffs." (CM/ECF No.

---

    willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

*Georgia Pacific*, 318 F. Supp. at 1120-21. The Federal Circuit "has sanctioned the use of the *Georgia-Pacific* factors to frame the reasonable royalty inquiry." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 60 (Fed. Cir. 2012).

9

1271 at 21.) Teva asserts that Dr. Vellturo's failure to model his analysis on Teva's manufacture and sale of generic pantoprazole rather than branded Protonix is contrary to law because "the statute [35 U.S.C. § 284] requires compensation to be based on the actual infringement . . . not some other hypothetical infringement." (*Id.* at 22.) *Second*, Teva claims that Dr. Vellturo's analysis lacks a factual predicate because he "postulates that Defendants would sell pantoprazole for a higher selling price and would earn greater profits than Teva or Sun [actually] achieved in the real world." (*Id.*) *Third*, Teva maintains that Dr. Vellturo "alters the relationship between the parties" by modeling "a license under which Defendants would sell branded Protonix rather than generic pantoprazole." (*Id.*)

In essence, Teva's argument is that the facts built into Dr. Vellturo's hypothetical negotiation should be based on how the events actually unfolded, rather than on Dr. Vellturo's assessment of how the negotiation would have developed prior to infringement. This argument is unavailing.

As an initial matter, Teva's actual infringing use and the use authorized under Dr. Vellturo's hypothetical license are the same, namely, the manufacture and sale of pantoprazole. More importantly, the proper calculation of reasonable royalties is based not on a *post hoc* analysis of what actually happened, but "on the royalty to which a willing licensor and a willing licensee would have agreed <u>at the time the infringement began</u>." See *Radio Steel & Mfg. Co. v. MTD Products, Inc.*, 788 F.2d 1554, 1557 (Fed. Cir. 1986) (citing *Panduit v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1158 (Fed. Cir. 1978)); *see also Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1981 (Fed. Cir. 1983) ("The issue of the infringer's profit is to be determined not on the basis of a hindsight evaluation of what actually happened, but on the basis of what the parties to the hypothetical license would have considered at the time of the

negotiations."). In Dr. Vellturo's opinion, Plaintiffs would have never agreed to grant Teva a license to manufacture and sell generic pantoprazole to compete with Protonix. (*See* CM/ECF No. 1274-1 at 18, ¶ 220.) Although Teva may challenge the assumptions Dr. Vellturo built into his hypothetical model at trial, the Court is not convinced that these assumptions are so divorced from the facts of this case as to warrant excluding Dr. Vellturo's opinion on reasonable royalties at this time.

      ii.      <u>Dr. Vellturo's Application of the Willing Licensee/Willing Licensor Framework</u>

The premise of the hypothetical negotiation framework set forth in *Georgia-Pacific* is that "a voluntary agreement will be reached between a willing licensor and a willing licensee, with validity and infringement of the patent not being disputed." *See LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 77 (Fed. Cir. 2012).

According to Teva, Dr. Vellturo has abandoned the *Georgia-Pacific* framework by concluding that "Plaintiffs would not have agreed to license Teva's or Sun's generic competition with branded Protonix." (CM/ECF No. 1271 at 28.) Teva asserts that Dr. Vellturo's rejection of any possibility that Plaintiffs would have licensed a generic product that would compete with Protonix "infects his entire royalty analysis." (*Id.*) Teva also suggests that Dr. Vellturo's opinion on reasonable royalties is unreliable because the terms of Dr. Vellturo's hypothetical licensing agreement would have required Teva to pay royalties (i.e., $1.85 per tablet) in excess of the revenue that Teva actually earned on the sale of pantoprazole (i.e., $1.36 per tablet on average). (*See* CM/ECF No. 1370 at 27-32.)

Put succinctly, Teva's argument is that Dr. Vellturo's hypothetical model lacks credibility because that model would have Teva pay a reasonable royalty that would cause it to operate at a loss. This argument is unavailing for two main reasons. First, the Federal Circuit

11

has specifically rejected the notion "that a reasonable royalty can never result in an infringer operating at a loss." *See Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1374 (Fed. Cir. 2008), *modified by* 557 F.3d 1377 (Fed. Cir. 2009). Second, and more importantly, assessing the credibility of Dr. Vellturo's hypothetical model and his conclusions is a function for the jury. *See, e.g., Oddi*, 234 F.3d at 145; *cf. TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 900 (Fed. Cir. 1986) ("The willing licensee/licensor approach must be flexibly applied as a device in the aid of justice.") (internal quotation marks and citation omitted).

    iii.    <u>Dr. Vellturo's Analysis of Reasonable Royalties for Expansion Sales</u>

"Expansion sales" or "expansion units" are "sales of the Teva and Sun generic pantoprazole products that Plaintiffs would not have made." (CM/ECF No. 1274-1 at 8, ¶ 189.) Dr. Vellturo calculated two alternative damages awards using a reasonable royalty. Under one alternative, Dr. Vellturo applied a reasonable royalty of $1.85 per tablet on all infringing sales, but excluded expansion sales from his analysis. (*See id.* at 23, ¶ 250.) Under the other alternative, Dr. Vellturo calculated lost profits on sales lost to Defendants' generics, and then applied a reasonable royalty of $1.85 per tablet only to expansion sales. (*Id.* at 8, ¶ 129.)

The essence of Teva's argument in favor of excluding Dr. Vellturo's opinion on reasonable royalties for expansion sales is that Dr. Vellturo erred in concluding that the amount of the reasonable royalty applicable in each of his alternative scenarios is the same. (*See* CM/ECF No. 1271 at 32-37.) Specifically, Teva argues that Dr. Vellturo would give Plaintiffs their "full profit margins on expansion sales" which would result in "an undeserved windfall that not only would leave them far richer than they would have been in a world without infringement but also lacks any connection to an appropriate royalty for Defendants' infringing sales." (CM/ECF No. 1271 at 33.)

12

Teva's argument goes to the weight of Dr. Vellturo's conclusions, not their admissibility. At trial, Teva is free to argue to the jury that Dr. Vellturo's methodology is flawed, and that his conclusion concerning the reasonable royalty on expansion sales to which Plaintiffs are entitled is wrong. Teva's disagreement with Dr. Vellturo's methodology and conclusions, however, is no reason to preclude the jury from hearing and evaluating the merits of his opinions. *See, e.g., Oddi*, 234 F.3d at 145; *see also Voilas*, 73 F. Supp. 2d at 461-62 (D.N.J. 1999).

    iv.    <u>Dr. Vellturo's Consideration of the Licensing History for Pantoprazole</u>

Teva maintains that Dr. Vellturo's reasonable royalty analysis is unreliable and inadmissible because it "is completely untethered to the past licensing history [of pantoprazole]." (CM/ECF No. 1271 at 43.) Specifically, Teva takes exception to Dr. Vellturo's conclusion that past licenses for pantoprazole "provide no insight into the likely reasonable royalty rate the parties would have agreed to." (*Id.* at 41.) Teva further maintains that Dr. Vellturo "disregards every single existing license agreement for patent rights to the pantoprazole compound." (*Id.* at 39.)

Teva's argument does not compel this Court to exclude Dr. Vellturo's opinion on reasonable royalties for two reasons. First, Teva is wrong to assert that Dr. Vellturo disregarded prior licensing agreements for patent rights to pantoprazole. In his report, Dr. Vellturo explains that he did consider prior licensing agreements, but determined that they were not germane to the reasonable royalty analysis. (*See* CM/ECF No. 1274-1 at 224-28.) Second, Teva's disagreement with Dr. Vellturo's conclusions vis-à-vis prior licensing agreements is no reason to exclude his reasonable royalty opinion. *See Oddi*, 234 F.3d at 145; *ZF Meritor, LLC*, 696 F.3d at 290.

Indeed, Teva's argument with respect to Dr. Vellturo's consideration of the licensing history of pantoprazole is relevant to the credibility of his conclusions. Such credibility determinations, however, are for the jury to make.

      c.      <u>Admissibility of Dr. Vellturo's Opinion on Altana's Lost Profits or Lost Royalties</u>

This Court has already ruled that Nycomed may not recover damages for lost profits on lost sales. Accordingly, Dr. Vellturo may not testify that Nycomed is entitled to such damages.

The Court has, nevertheless, made clear that Nycomed "is not precluded from seeking, in addition to a 'reasonable royalty' pursuant to 35 U.S.C. § 284, its actual lost royalties to the extent proved at trial." (CM/ECF No. 1230.) As this Court has explained in a separate Opinion addressing the merits of Teva's motion *in limine* filed as Docket Entry No. 1266, an award of lost royalties is "inextricably intertwined" with lost profits on lost sales. Thus, for the reasons more thoroughly set forth in that Opinion, the Court will not preclude Dr. Vellturo from opining on the lost royalties to which he believes Plaintiffs are entitled.

      2.      <u>Teva's Motion as to Dr. Leitzinger</u>

Teva maintains that it would be legally inappropriate for Dr. Leitzinger to opine "that Sun should not have to pay damages to Plaintiffs for the infringing sales that Sun made because, if Sun had not made those sales, some other infringer might have made them instead." (CM/ECF No. 1271 at 45.) Sun does not disagree with Teva's legal position. It acknowledges that under the law, "[a]n accused infringer cannot allocate sales to another infringing product in an effort to avoid a lost profits on lost sales award." (*See* CM/ECF No. 1316, citing *Bros. Inc. v. W.E. Grace Mfg. Co.*, 320 F.2d 594, 598 (5th Cir. 1963)).

Nevertheless, Sun maintains that Teva's motion "to exclude portions of Dr. Leitzinger's testimony is premised on the erroneous assertion that Dr. Leitzinger assumed a but-for world

where Sun is not liable for lost profit damages on its infringing sales because Teva might have made those sales." (CM/ECF No. 1316 at 13.) In its brief in opposition to Teva's motion, Sun asserts that "[t]he real 'nub' of Dr. Leitzinger's opinion is that [Plaintiffs' expert] is simply wrong to claim that Sun's sales came from Protonix [because] . . . at the time of Sun's launch, there was already a generic market for pantoprazole which included Wyeth's authorized generic." (*Id.* at 16.)

As Sun has acknowledged, the presence of other infringing generics in the marketplace does not defeat Wyeth's entitlement to lost profit damages on Sun's sales. *See, e.g., Bros. Inc. v. W.E. Grace Mfg. Co.*, 320 F.2d at 598. Accordingly, Teva's motion is granted to the extent that it seeks to preclude Dr. Leitzinger from testifying that Sun is not liable for lost profit damages on account of Teva's sales. Nevertheless, as this Court has previously held, whether Wyeth's own generic would have entered the market absent Defendants' infringement presents an issue of fact for the jury to decide. (*See, e.g.,* CM/ECF No. 1236.) Accordingly, Sun is entitled to use its expert to advance its theory that certain lost sales were attributable to Wyeth's own generic, rather than Sun's infringing product.

## IV. CONCLUSION

For the foregoing reasons, Teva's motion is denied to the extent that it seeks to preclude Dr. Vellturo from opining on damages resulting from price erosion and reasonable royalties. Teva's motion is granted to the extent that it seeks to preclude Dr. Vellturo from opining on lost profit damages to which Nycomed is entitled. Finally, as to Dr. Leitzinger, Teva's motion is granted only to the extent that it seeks to preclude Dr. Leitzinger from testifying that Sun is not liable for lost profit damages on account of Teva's sales; Dr. Letizinger may opine on the extent

to which he believes that certain lost sales were attributable to Wyeth's own generic rather than Sun's infringing product. An appropriate order follows.

Dated: __14__ of May 2013.

_____
JOSE L. LINARES
U.S. DISTRICT JUDGE