UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ALTANA PHARMA AG and WYETH,<br><br>Plaintiffs,<br><br>v.<br><br>TEVA PHARMACEUTICALS USA, INC., et al.,<br>Defendants. | Civil Action No. 04-2355 (JLL)<br><br>OPINION |

**LINARES,** District Judge.

This matter comes before the Court by way of Teva's motion in limine seeking to: (1) preclude evidence or argument that Teva and Sun should be jointly and severally liable for price erosion damages, (2) preclude Plaintiffs from offering evidence or argument in support of a lost royalties theory of damages, (3) exclude evidence or argument concerning the costs of researching and developing new drugs, (4) exclude evidence or argument concerning any so-called 'at risk' generic launches by Teva, other than Teva's sale of generic pantoprazole, and (5) preclude evidence or argument concerning drug interactions between clopidogrel and omeprazole or esomeprazole. The Court has considered the submissions made in support of and in opposition to Teva's motion, and decides this matter without oral argument pursuant to Fed. R. Civ. P. 78. For the reasons set forth below, Teva's motion [CM/ECF No. 1266] is **denied.**

1

A.  **BACKGROUND AND LEGAL STANDARD**

Because the Court has extensively set forth the facts of this case in numerous summary judgment opinions, only those facts specifically pertinent to the instant motion are discussed below.

1.  **General Standard for Deciding Motions *In Limine*[1]**

District Courts have broad discretion "in determining the admissibility of evidence under the Federal Rules." *See United States v. Abel*, 469 U.S. 45, 54 (1984). Courts may exercise this discretion to rule on motions *in limine* "to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions." *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1069 (3d Cir. 1990). It is generally appropriate, however, for courts to reserve judgment on a motion *in limine* until trial. *See, e.g., Kraemer v. Franklin & Marshall College*, No. 95-0020, 1995 WL 689361, at *1 (E.D. Pa. Nov. 13, 1995) ("The Court declines to rule on whether to exclude this testimony before it has been placed into a specific context at trial."); *see also Hawthorne Partners v. AT&T Technologies, Inc.*, 831 F. Supp. 1398, 1400 (N.D. Ill. 1993) ("This court has the power to exclude evidence in limine only when evidence is clearly inadmissible on all potential grounds").

---

[1] Under Federal Circuit precedent, regional circuit law governs evidentiary questions. *See, e.g., Meyer Intellectual Props. Ltd. v. Bodum, Inc.*, 690 F.3d 1354, 1371 (Fed. Cir. 2012) ("We review the district court's decision to exclude evidence under the law of the relevant circuit."). Accordingly, Third Circuit precedent guides this Court's evidentiary determinations.

2

## 2. Standard for Admissibility of Expert Testimony

The admissibility of expert testimony is governed by Fed. R. Evid. 702, which provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) The testimony is based on sufficient facts or data;
>
> (c) The testimony is the product of reliable principles and methods; and
>
> (d) The expert has reliably applied the principles and methods to the facts of the case.

The Third Circuit has held that Rule 702 "embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (citations omitted). To satisfy the qualification requirement, a witness must "possess specialized expertise." *Id.* at 404. This requirement is interpreted liberally; "a broad range of knowledge, skills, and training qualify an expert as such." *In re Paoli R.R. Yard Pcb Litig.*, 35 F.3d 717, 741 (3d Cir. 1994). To be reliable, there must be a link "between the facts [underlying the expert's opinion] and the conclusion." *ZF Meritor*, 696 F.3d at 291; *see also Kumho Tire*, 526 U.S. at 157 (observing that courts are not required "to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert") (internal citations omitted). Finally, the question as to whether an expert's proffered testimony is a fit is one of relevance that requires the court to determine whether the proffered testimony "will aid the jury in resolving a

3

factual dispute." *See Lauria v. AMTRAK*, 145 F.3d 593, 599-600 (3d Cir. 1998) (quoting *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 591 (1993)).

It is well settled that district courts must serve a "gatekeeping function" to ensure that an expert's testimony satisfies the requirements of Rule 702. *See, e.g., Daubert*, 509 U.S. at 592-95; *Kumho Tire Co.*, 526 U.S. at 141. In performing this function, courts must be mindful that Rule 702 "has a liberal policy of admissibility." *Pineda v. Ford Motor Co.*, 520 F.3d 237 (3d Cir. 2008). Indeed, the Third Circuit has observed that the standard for admissibility "is not intended to be a high one." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000). The proponent of expert testimony need not prove that its expert is correct, but that the expert's "opinion is based on valid reasoning and a reliable methodology." *Id.* at 146. "The analysis of conclusions themselves is for the trier of fact when the expert is subject to cross-examination. *Id.*; *see also ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 290 (3d Cir. 2012) (holding that mere existence of evidence in the record that contradicted expert's conclusion was no basis to exclude expert's testimony).

3. **Standard for Exclusion of Testimony under Rule 403**

Even if relevant, expert testimony may be excluded under Rule 403. *See, e.g., Daubert*, 509 U.S. at 595. Rule 403 allows district courts to exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "Pretrial Rule 403 exclusions should rarely be granted." *In re Paoli R. Yard PCB Litig.*, 916 F.2d 829, 859-60 (3d Cir. 1990) ("In sum, we hold that in order to exclude evidence under Rule 403 at the pretrial stage, a court must have a record

complete enough on the point at issue to be considered a virtual surrogate for a trial record.").
*Id.* at 859.

B.  **ANALYSIS**

As previously stated, Teva has filed a motion in limine seeking to: (1) preclude evidence or argument that Teva and Sun should be jointly and severally liable for price erosion damages, (2) preclude Plaintiffs from offering evidence or argument in support of a lost royalties theory of damages, (3) exclude evidence or argument concerning the costs of researching and developing new drugs, (4) exclude evidence or argument concerning any so-called 'at risk' generic launches by Teva, other than Teva's sale of generic pantoprazole, and (5) preclude evidence or argument concerning drug interactions between clopidogrel and omeprazole or esomeprazole. The Court will now address each motion, in turn.

1. **Teva's motion to preclude evidence or argument that Teva and Sun should be jointly and severally liable for price erosion damages**

Sun has filed its own motion in limine seeking to preclude evidence or argument that Defendants should be held jointly and severally liable for any price erosion damages. The Court intends to rule on both motions concerning joint and several liability at oral argument, which is currently scheduled for Monday, May 13, 2013. Accordingly, this aspect of Teva's motion will not be addressed herein.

2. **Teva's motion to preclude Plaintiffs from offering evidence or argument in support of a lost royalties theory of damages**

Teva[2] moves to preclude Plaintiffs from offering evidence or argument in support of a lost royalties theory of damages on the basis that Nycomed has, throughout this litigation, relied

---

[2] Sun joins in this aspect of Teva's motion.

on a lost profits—and not a lost *royalties*—theory of damages. According to Teva, Nycomed raised the theory of "lost royalties" for the first time on a motion for reconsideration in November 2012 after the Court held that it was not entitled to lost profit damages. As a result, Teva maintains that Nycomed should not be permitted to present Dr. Vellturo's lost profits calculation to the jury and simply re-label that analysis as a "lost royalties" calculation. In the alternative, Teva argues that if Nycomed is permitted to assert a "lost royalties" theory of damages, then its recovery should be limited to the patent royalty specified in the License Agreement, which is, according to Teva, 5% of Wyeth's lost net sales.

In opposition, Plaintiffs maintain that Nycomed has always sought damages based on its lost 25% royalty. Plaintiffs further maintain that Dr. Vellturo's opening expert report explicitly disclosed that he was calculating Nycomed's losses based on the 25% royalty it lost from Wyeth; thus, Plaintiffs did not fail to disclose this theory. Moreover, Plaintiffs argue that Nycomed's recovery is not limited to a 5% "patent royalty;" rather, Plaintiffs may seek to recover a 25% royalty which is comprised of various royalty components contained in the License Agreement—such as the patent royalty, know-how royalty, trademark royalty, etc. In support of their position, Plaintiffs point out that none of the Federal Circuit cases addressing lost royalties set forth any particular rule that damages are limited to "patent royalties." Such a rule would, according to Plaintiffs, contravene Federal Circuit precedent emphasizing that an injured patentee may recover for any foreseeable harm caused by the infringement.

By way of background and for purposes of clarity, this Court has held the following in the context of this action:

(a) To recover lost profits damages, a patent owner must show that "but for" the infringement, it would have made the infringer's

sales. *BIC Leisure*, 1 F.3d at 1218; *Poly-America, L.P. v. GSE Lining Tech.*, 383 F.3d 1303, 1311-12 (Fed. Cir. 2004). Lost profits damages are not, as a matter of law, available to Nycomed because, *inter alia*, it sold no product that competed directly with Defendants' pantoprazole tablets. *See* November 5, 2012 Op.

(b) A patent owner is entitled to receive lost royalties on amounts its licensees would have paid "but for" the infringement. *BIC Leisure*, 1 F.3d at 1219. Nycomed is not precluded from seeking its actual lost royalties, to the extent proven at trial. *See* December 18, 2012 Order.

Having carefully considered the parties' positions, the Court finds, first, that Plaintiffs should not be precluded from presenting a theory of lost royalties to the jury. As a preliminary matter, the Court's December 18, 2013 Order already addressed this issue. *See* Dec. 18, 2013 Order at 2-3 ("This Court's November 5, 2012 Opinion is hereby modified to reflect that Nycomed is not precluded from seeking, in addition to a "reasonable royalty" pursuant to 35 U.S.C. § 284, its actual lost royalties, to the extent proven at trial."). Defendants did not seek reconsideration, clarification or modification of this Court's December 18, 2013 Order. This ruling, as well as the rulings set forth above, are now law of the case and will not be revisited on a motion in limine.

Although the Court agrees with Defendants that an award of lost royalties is distinct from an award of lost profits on lost sales,[3] certainly in a case such as this one, the two are, to a certain

---

[3] *See BIC Leisure*, 1 F.3d at 1218 ("To recover lost profits as opposed to royalties, a patent owner must prove a causal relation between the infringement and its loss of profits. The patent owner must show that "but for" the infringement, it would have made the infringer's sales. . . . With

7

extent, inextricably intertwined. That being said, to the extent Nycomed takes the position that its "lost royalties" are comprised of various royalty components—beyond the 5% "patent royalty" provided for in the parties' License Agreement—it will, of course, have the burden of proving to the jury that such components of its alleged lost royalties are, in fact, attributable to the Defendants' infringement of the patent-in-suit. *See BIC Leisure*, 1 F.3d at 1219 ("With regard to royalties, Windsurfing is entitled to receive lost royalties []on amounts Windsurfing's licensees would have paid "but for" the infringement").

Next, to the extent Defendants seek to preclude evidence or argument concerning lost royalties pursuant to Federal Rule of Civil Procedure 37(c) on the basis that Plaintiffs never disclosed the lost royalties theory in discovery, Teva's motion is denied inasmuch as the Court finds that the totality of the circumstances do not weigh in favor of exclusion on this basis. In particular, the Court notes that: (1) Defendants have been on notice that Plaintiffs' damages expert, Dr. Vellturo, based Nycomed's lost profits calculations on 25% of Wyeth's net sales since January 20, 2012—the date on which he submitted his opening report (Vellturo Report, ¶¶ 49, 225); (2) Paragraph 17 of Plaintiffs' Statement of Additional Facts in Support of their Opposition to Defendants' Motion for Partial Summary Judgment Precluding Plaintiff Altana Pharma AG from Recovering Lost Profits Damages, filed on August 24, 2012, stated that "for every dollar of sales lost by Wyeth in the form of lost sales or price erosion on actual sales, Altana lost at least $0.25 in royalties"; (3) this Court's December 18, 2013 Order made clear that "this Court's November 5, 2012 Opinion is hereby modified to reflect that Nycomed is not precluded from seeking, in addition to a 'reasonable royalty' pursuant to 35 U.S.C. § 284, its

---

regard to royalties, Windsurfing is entitled to receive lost royalties (on amounts Windsurfing's licensees would have paid 'but for' the infringement)").

actual lost royalties, to the extent proven at trial"; and (4) Defendants did not seek reconsideration, clarification or modification of this Court's December 18, 2013 Order.

In light of these factors, and absent a clearer directive from the Federal Circuit, the Court finds that the categories of lost royalties damages and lost profits damages are sufficiently related such that Plaintiffs should be permitted to present a theory of "lost royalties" to the jury, despite having previously couched their theory vis-à-vis Nycomed as one of "lost profits." The Court's holding in this regard should not be read as suggesting that Plaintiffs are legally or factually entitled to an award of lost royalties. Nor does the Court's holding have any bearing on the sufficiency of Plaintiffs' proofs on this issue.

Finally, to the extent Defendants ask the Court to limit Nycomed's potential recovery under a lost royalties theory to the 5% patent royalty set forth in the License Agreement, Defendant's request is also denied. The Federal Circuit's decision in *BIC Leisure* does not discuss, much less limit, what may comprise a patent "royalty" or "lost royalties." Defendants cite to no other Federal Circuit decisions in support of their view.[4] In the same vein, the Federal Circuit has, in no uncertain terms, emphasized that a patentee may recover for *any* reasonably foreseeable damages caused by a defendant's infringement and that there are no strict limits as to how the patentee can prove its harm. *See, e.g., Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538,

---

[4] Instead, Defendants rely exclusively on a decision by the Court of Appeals for the Sixth Circuit, *Cold Metal Process Co. v. E. W. Bliss Co.*, 285 F.2d 231, 241 (6th Cir. 1960), wherein the Court held, in pertinent part: "[T]he grant of an exclusive license to United to 'make, use and sell' the mills in question limited Cold Metal's income from patent 195 to the stipulated royalty for each mill." The Court finds that Defendants read too much into this language. This is particularly so given that the Court's holding was clearly tailored to the particular contractual terms at issue in that case. *See id.* ("The District Judge reasoned that *under the contract* . . . the only interest which Cold Metal had in this basic mill stand was the right to collect royalties for its manufacture, use or sale.").

1546 (Fed. Cir. 1995) ("If a particular injury was or should have been reasonably foreseeable by an infringing competitor in the relevant market, broadly defined, that injury is generally compensable absent a persuasive reason to the contrary."); *King Instruments Corp. v. Perego*, 65 F.3d 941, 947 (Fed. Cir. 1995) ("Section 284 imposes no limitation on the types of harm resulting from infringement that the statute will redress. The section's broad language awards damages for any injury as long as it resulted from the infringement. Though this section sets a lower limit of a reasonable royalty on the amount of recovery, it mandates an amount 'adequate to compensate for the infringement.' "). In light of the foregoing, the Court declines to rule, as a matter of law, that Nycomed's potential recovery under a theory of lost royalties should be limited to the 5% "patent royalty" contained in the License Agreement. As previously stated, Plaintiffs will bear the ultimate burden of proof at trial to show Nycomed's entitlement to the lost royalties they maintain are attributable to Defendants' infringement of the '579 patent. *See BIC Leisure*, 1 F.3d at 1219. To the extent Defendants believe that Plaintiffs have failed to meet their burden, Defendants may renew their argument at the conclusion of the damages trial. Teva's motion is therefore denied.

### 3. Teva's motion to exclude evidence or argument concerning the costs of researching and developing new drugs

Teva moves to preclude Plaintiffs from introducing evidence of or referring to the "average" or "typical" costs of researching and developing new drugs because this evidence is irrelevant, unfairly prejudicial, and because Plaintiffs have not presented evidence of *actual* research and development costs incurred by Nycomed in developing pantoprazole. Teva's motion is presumably brought under Federal Rules of Civil Procedure 401 and 403. Teva maintains that Plaintiffs have failed to offer any expert opinion that the research and

development costs associated with pantoprazole fell within the "average" or "typical" range. Thus, without tying such average or typical costs to the particular parties in this case or the drug at issue, the research and development costs are—according to Teva—simply not relevant to the amount of damages to which Plaintiffs are entitled. Even if relevant, Teva argues that such evidence should nevertheless be excluded as unfairly prejudicial to the Defendants and misleading to the jury.

Plaintiffs oppose Teva's motion by noting that neither Wyeth nor Nycomed track research and development costs on a product specific basis and neither are seeking to recover those costs as damages here. Plaintiffs are, however, intending to present witnesses at trial from Wyeth and Nycomed who will provide non-quantitative background on activities that went into bringing Protonix to market and making it a success. According to Plaintiffs, similar evidence was admitted in the liability trial in this case—specifically, Mr. Germano, a witness for Wyeth, testified that Wyeth's research and development investments increased by about a million dollars between 2003 and 2006. In addition to providing important context, Plaintiffs maintain that evidence of Plaintiff's research and development expenditures and typical costs associated with bringing a branded product to market is critical to counterbalancing Defendants' arguments regarding incentives for generic manufacturers to copy branded companies' products and the benefits to consumers of low-cost generic drugs. In other words, Plaintiffs argue that they should have the opportunity to present the branded companies' side of the Hatch-Waxman "compromise," including evidence of their research and development expenditures.

Having considered the parties' positions, the Court finds that deciding this issue at this time would be premature. If Plaintiffs ultimately seek to offer evidence or testimony concerning average research and development costs without first establishing its relevancy to the issue of

damages, or if the testimony would not be helpful to the determination of a fact in issue, Teva may object. The Court declines, however, to rule on whether to exclude this type of evidence or testimony (pursuant to Rules 401 or 403) before it has been placed into a specific context at trial. *See, e.g., In re Paoli R.R. Yard PCB Litig.*, 916 F.2d at 859 (holding that "in order to exclude evidence under Rule 403 at the pretrial stage, a court must have a record complete enough on the point at issue to be considered a virtual surrogate for a trial record" and stressing that "pretrial Rule 403 exclusions should rarely be granted"). To the extent Defendants are concerned that the jury will be confused by this evidence and/or will seek to award Plaintiffs such research and development costs, that concern can be cured by appropriate jury instructions as to how damages should be determined. Teva's motion is therefore denied.

### 4. Teva's motion to exclude evidence or argument concerning any so-called "at risk" generic launches by Teva, other than Teva's sale of generic pantoprazole

Teva moves to preclude Plaintiffs from arguing or presenting evidence concerning Teva's so called "at-risk" launches of generic products (other than its launch of generic pantoprazole) and/or from arguing that Teva employs a business model of launching generic products prior to a final court decision. Teva's other "at risk" launches involving *other* generic products are—according to Teva—completely irrelevant to the amount of damages owed to Plaintiffs vis-à-vis Teva's launch of generic pantoprazole. Teva maintains that such evidence is irrelevant, inadmissible under Rules 401 and 403, could lead the jury to inflate its damages award to punish Teva, and would serve only to unfairly prejudice Teva.

Plaintiffs oppose Defendant's motion on two grounds: (1) evidence of Teva's other "at risk" launches is relevant to establishing the reliability of Teva's pre-launch forecasts of generic

pantoprazole sales, "particularly because Teva attempts to dismiss its forecasts as mere templates,"[5] and (2) Teva's launches of two other proton pump inhibitors (PPIs) are relevant to Teva's litigation position that Plaintiffs' projected sales are inflated because the market viewed all PPIs as interchangeable.

As to their first point, Plaintiffs explain that their expert, Dr. Vellturo, used pre-launch forecasts generated by Teva prior to its "at risk" launch of generic pantoprazole to confirm his independent analysis of expected generic substitution for branded Protonix, demand expansion sales and price erosion. (Pl. Opp'n Br. at 44). According to Plaintiffs, Teva now seeks to discredit its own pre-launch forecasts. In particular, Plaintiffs maintain that Teva's expert, Dr. Schondelmeyer, seeks to discredit Teva's pre-launch forecasts because they were allegedly developed from a standard form template. Thus, it is Plaintiffs' position that evidence of Teva's other "at risk" launches is relevant to establishing the reliability of Teva's forecasts. "It demonstrates that even if Teva's pre-launch forecasts were 'developed from a standard form template,' they are also robust predictions of the effects of generic entry by a sophisticated and experienced player in the generic drug market." (Pl. Opp'n Br. at 45).

As to their second point, Plaintiffs argue that Teva's launch of two competing PPIs, generic omeprazole and lansoprazole, whether or not "at risk," are of particular relevance to this case inasmuch as three of Teva's damages experts criticize Plaintiffs' expert, Dr. Vellturo, for not properly accounting for the competition Protonix faced from other PPIs. In particular, according to Plaintiffs, each opines that Dr. Vellturo failed to recognize that the market viewed all PPIs as interchangeable. Thus, it is Plaintiffs' position that evidence of Teva's launches and sales of generic omeprazole and generic lansoprazole is potential impeachment or cross-

---

[5] (Pl. Opp'n Br. at 43).

examination evidence to demonstrate that Teva does not hold its experts' opinions of the interchangeability of PPIs outside of this litigation (i.e., if the market viewed PPIs as interchangeable, Teva would have had no incentive to risk a damages award in this case by launching generic pantoprazole "at risk" in 2007 when it had been selling generic omeprazole since at least 2004).

Having considered the parties' positions, the Court denies Teva's motion. If Plaintiffs ultimately seek to offer evidence or testimony concerning Teva's other "at risk" launches without establishing a proper foundation, Teva may object. The Court declines, however, to rule on whether to exclude this type of evidence or testimony (pursuant to Rules 402 or 403) before it has been placed into a specific context at trial. *See, e.g., In re Paoli R.R. Yard PCB Litig.*, 916 F.2d at 859 (holding that "in order to exclude evidence under Rule 403 at the pretrial stage, a court must have a record complete enough on the point at issue to be considered a virtual surrogate for a trial record" and stressing that "pretrial Rule 403 exclusions should rarely be granted"). This is particularly so given Plaintiffs' position that evidence of Teva's launches and sales of generic omeprazole and generic lansoprazole is potential impeachment evidence to demonstrate that Teva does not hold its experts' opinions of the interchangeability of PPIs outside of this litigation. To the extent Teva is concerned that the jury will be confused by this evidence and/or will seek to improperly inflate any damages award to punish Teva, such concerns can be cured by appropriate jury instructions as to how damages should be determined. Teva's motion is therefore denied.

5. **Teva's motion to preclude evidence or argument concerning drug interactions between clopidogrel and omeprazole or esomeprazole.**

By way of background, Teva explains that, in the liability phase of this case, Plaintiffs submitted the expert report of Dr. Sloan, opining that clopidogrel (Plavix) had a potential drug-drug interaction with the proton-pump inhibitor (PPI) omeprazole, but not with pantoprazole, and that, therefore, pantoprazole has certain advantages over omeprazole. According to Teva, Defendants were prepared to counter Plaintiffs' contentions on the issue; however, following the deposition of Dr. Hoden, Plaintiffs stated that Dr. Sloan would not be offering an opinion on the issue of drug-drug interactions between PPIs and clopidogrel/Plavix in connection with this litigation. According to Teva, Plaintiff's pretrial submissions now suggest that they intend to interject this issue into the damages trial. As a result, Teva urges the Court to preclude Plaintiffs from doing so because such evidence is irrelevant to the issues before the Court, Plaintiffs have no expert to explain the issue, and its introduction would unfairly prejudice the Defendants.

Plaintiffs oppose Teva's motion on the basis that, because of new arguments presented by Defendants in the damages phase of the case (arguments that did not exist in the liability phase), the drug-drug interactions issue is now a "potentially relevant responsive argument" for the Plaintiffs. In particular, Plaintiffs argue that Defendants, through Dr. Schubert and other experts, are now taking the position that all PPIs are interchangeable and thus doctors would simply have prescribed the cheapest PPI. Plaintiffs argue that a key premise underlying Dr. Schubert's opinion is that all PPIs are equally safe. The existence of drug interactions relating to certain PPIs, including omeprazole, is—according to Plaintiffs—a key safety issue that was not addressed by Dr. Schubert. Thus, Plaintiffs maintain that they should be permitted to cross-examine Dr. Schubert on this issue. Plaintiffs further maintain that they never waived the right to cross-examine Defendants' expert witnesses regarding deficiencies in their opinions. Nor should

15

it prejudice or surprise Defendants that, when they put forth an expert who opines that all PPIs are equally safe, that expert would be challenged for ignoring key safety issues when developing his opinion.

Having carefully considered the parties' positions, the Court agrees with Plaintiffs that, to the extent Teva's expert Dr. Schubert testifies that all PPIs are interchangeable and thus equally safe, Plaintiffs should be permitted cross-examine Dr. Schubert on the issue of safety. To the extent Teva asks the Court to preclude Plaintiffs from relying, in particular, on evidence of potential drug-drug interactions between clopidogrel and omeprazole or esomeprazole in their cross-examination based simply on Plaintiffs' alleged representation that Dr. Sloan was not going to offer an opinion on this issue during the liability phase of this case, Teva's motion is denied. That this issue may not have been relevant in the context of the liability trial in this matter does not, alone, render the subject matter inadmissible for purposes of the damages trial. Again, if Teva's expert intends to testify that all PPIs are interchangeable and thus equally safe, then evidence on the issue of safety may be used to impeach said expert's opinion. Teva's motion is therefore denied.

## CONCLUSION

For the reasons set forth above, Teva's motion in limine seeking to: (1) preclude evidence or argument that Teva and Sun should be jointly and severally liable for price erosion damages, (2) preclude Plaintiffs from offering evidence or argument in support of a lost royalties theory of damages, (3) exclude evidence or argument concerning the costs of researching and developing new drugs, (4) exclude evidence or argument concerning any so-called 'at risk' generic launches by Teva, other than Teva's sale of generic pantoprazole, and (5) preclude evidence or argument

16

concerning drug interactions between clopidogrel and omeprazole or esomeprazole, 1266] is **denied**. An appropriate Order accompanies this Opinion.

Date: May 14, 2013

Jose L. Linares
United States District Judge