UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ALTANA PHARMA AG and WYETH,<br><br>       Plaintiffs,<br><br>  v.<br><br>TEVA PHARMACEUTICALS USA, INC., *et al.*,<br><br>       Defendants. | C.A. NO. 04-2355 (JLL) (MAH)<br><br>Consolidated with C.A. Nos.<br><br>05-1966 (JLL) (MAH)<br>05-3920 (JLL) (MAH)<br>06-3672 (JLL) (MAH)<br>08-2877 (JLL) (MAH)<br><br>Hon. Jose L. Linares, U.S.D.J.<br>Hon. Michael A. Hammer, U.S.M.J. |

## PLAINTIFFS' BENCH MEMORANDUM REGARDING PROFIT ALLOCATIONS FOR TAX PURPOSES

Liza M. Walsh
Hector D. Ruiz
Connell Foley LLP
85 Livingston Avenue
Roseland, NJ 07068

Of Counsel:

William F. Lee
Wilmer Cutler Pickering
Hale and Dorr LLP
60 State Street
Boston, MA 02109
T (617) 526-6556
F (617) 526-5000

William G. McElwain
Amy K. Wigmore
Tracey C. Allen
Perry A. Lange
Deborah A. Yates
Wilmer Cutler Pickering
Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
T (202) 663-6000
F (202) 663-6363

*Attorneys for Plaintiffs*
*Altana Pharma AG and Wyeth*

ActiveUS 108557982v.4

Plaintiffs respectfully submit this memorandum with respect to the "transfer pricing" issues raised by Defendants. The Defendants argue that some of the profits lost by Wyeth are not recoverable because, prior to the Defendants' infringement, a portion of Wyeth's income before taxes ("IBT") was allocated to Wyeth's Puerto Rican subsidiary ("WWPI") pursuant to United States tax law. As Plaintiffs have argued, and the Court has suggested during argument outside the presence of the jury, post-sale profit allocations for purely tax purposes are not relevant to the issues to be decided at trial.

At Defendants' request, the Court has indicated that Defendants may attempt to lay a foundation for such evidence by showing that Wyeth's allocations were for purposes other than taxes. Because information regarding Wyeth's tax allocations would be prejudicial to Plaintiffs, it would be unfair to allow the jury to hear such evidence if the issue ultimately turns out to be irrelevant, as Plaintiffs contend it is. Plaintiffs therefore request that the Defendants be required to lay the necessary foundation before questioning any witness about the tax allocation. Furthermore, Plaintiffs request that the Court allow voir dire of Defendants' transfer pricing

1

expert, Dr. Becker, or Pfizer's in-house tax lawyer, Michael Nelson,[1] prior to either's providing tax allocation testimony before the jury. If Defendants are unable to lay the necessary foundation with a particular witness or during voir dire, Plaintiffs will then renew their request to exclude such evidence as irrelevant and unduly prejudicial.

## I. BACKGROUND

On Monday, June 3, 2013, during argument regarding one of Teva's proposed opening demonstratives, the Court and parties discussed what triable disputes, if any, remain regarding Wyeth's historical allocation of Protonix profits to WWPI. During the course of argument, the Court questioned whether Wyeth's allocation of profits to WWPI was relevant to any issue in the case. (6/3/13 Tr., Vol. 1, at 243:19-22, 244:3-6, 248:3-6.) The Court also expressed concerns about the prejudicial nature of evidence concerning Wyeth's tax savings. (6/3/13 Tr., Vol. 1, at 248:3–249:16.)

On Thursday, June 6, during the cross examination of Mr. Boardman, Plaintiffs objected to questions concerning the tax allocation, arguing that

---

[1] Mr. Nelson is Senior Director, Global Tax Audit and Controversy at Pfizer. Defendants have stated their intention to call Mr. Nelson as an adverse witness to testify about the results of tax audits by the IRS that adjusted Wyeth's transfer pricing allocations.

2

Defendants should be required to lay a foundation before eliciting such testimony. (6/6/13 Tr., Vol. 4, at 149:3-8.)  The Court appeared to agree that Defendants were required to lay such a foundation, although the issue of doing so outside the presence of the jury did not come up.  (6/6/13 Tr., Vol. 4, at 149:2–151:24.) Counsel for Teva then asked Mr. Boardman a few questions about the tax allocations, to which Mr. Boardman testified that he was aware that "tax entries" were made but he was not the "tax expert" on such matters.  (6/6/13 Tr., Vol. 4, at 152:3–153:13.)

The Court's comments at trial regarding the tax allocation issue are consistent with its summary judgment order on this issue.  In its February 11, 2013 order, the Court denied Defendants' motion for summary judgment seeking to preclude Wyeth from recovering its lost profits that might later have been split with its Puerto Rican subsidiary, WWPI, for tax purposes.   In denying Defendants' motion, the Court stated:  "[T]he real issue before the Court is rather discreet—namely, whether Plaintiffs must, for purposes of recovering lost profits damages, take into account how Wyeth *would have* allocated its income from lost Protonix sales *for tax purposes* in the appropriate 'but for' infringement world." (Dkt. No. 1244 at 8.)  The Court further stated:  "That Wyeth chose, for a period of time pre-infringement, to pass a portion of the profits it earned to WWPI is

3

relevant to how Wyeth was treated for tax purposes during the relevant years; however, as stated above, Teva cites to no authority for the proposition that Wyeth's tax treatment is relevant to the remedies it seeks under 35 U.S.C. § 284." (Dkt. No. 1244 at 13.)  As the Court recognized, "As a practical matter, the Court finds that such an approach of limiting lost profits to lost taxable profits is far too speculative in nature and would be difficult to calculate inasmuch as Wyeth's deductions, losses and other offsets would affect its tax status in any given year and would need to be assessed and/or projected for each year in question." (Dkt. No. 1244 at 13.) [2]

Although denying the Defendants' motion, the Court held out the possibility that the relationship with WWPI might be relevant.  Specifically, the Court stated

---

[2]    *See Kalman v. Berlyn Corp.*, 914 F.2d 1473, 1483 (Fed. Cir. 1990) ("[T]he deduction of income taxes from a computation of lost profits damages 'runs into difficulty [because] . . . it is impossible to determine precisely what taxes will be paid, because the other income and deductions the plaintiff may have in the year of receipt of the award will affect the amount of taxes to be paid.'"); *Hughes Aircraft Co. v. United States*, 86 F.3d 1566, 1575 (Fed. Cir. 1996) (reducing damages to account for taxes "would be speculative due to Hughes' particular tax situation, including what actions Hughes might have taken to reduce such taxes in prior years"); *Krippelz v. Ford Motor Co.*, 670 F. Supp. 2d 815, 820 (N.D. Ill. 2009) ("[A] reduction [in damages] based on prior years' taxes would be too speculative and difficult to calculate, since Krippelz's deductions, losses and other offsets would affect his tax status and would need to be re-examined for each year in question.").

4

that it was making no finding that "Wyeth's allocation of revenues from the sale of Protonix to WWPI was, in fact, done for tax purposes," *id.* at 14, and indicated that this was a factual matter for the jury decide.

As set forth below, Plaintiffs believe that the evidence to date has shown, and the evidence will ultimately show beyond dispute, that any profit allocations by Wyeth to WWPI were solely for tax purposes, thus rendering them irrelevant to the issues to be decided at trial. Because evidence concerning Wyeth's tax savings is potentially prejudicial, such evidence should not be presented to the jury until Defendants make a threshold showing that profit-allocation evidence is relevant— *i.e.*, not solely for tax purposes.

## II.     TESTIMONY OF MICHAEL BOARDMAN AND ANTICIPATED TESTIMONY OF CHRISTOPHER VELLTURO

On Thursday, June 6, Plaintiffs presented testimony from Michael Boardman, a Pfizer Business Director who was Wyeth's Senior Director of Finance with authority for Protonix beginning in 2008. (6/6/13 Tr., Vol. 4, at 110:19–112:18.)

Mr. Boardman testified, *inter alia*, as follows:

1.      At all times, Wyeth (later Wyeth LLC), a plaintiff in this case, booked all revenues for third-party sales of Protonix and later Wyeth's OG. None

5

of these revenues was ever booked by WWPI.  (*Id.* at 118:10-18, 125:21–126:8, 130:2–131:10.)

2. Wyeth's primary measure of profitability for Protonix (and all products), both before and during the damages period, was Direct Brand Profit. (*Id.* at 114:17-19, 115:5-17.)  Generally speaking, Direct Brand Profit is net sales minus all expenses directly associated with the product, including cost of goods sold and any marketing or selling expenses directly related to the product.  (*Id.* at 114:2-9, 114:22–115:4.)  Wyeth's Direct Brand Profit for Protonix (and all other products) was calculated according to Generally Accepted Accounting Principles ("GAAP").  (*Id.* at 115:18–116:2.)

3. At all times, Wyeth's Direct Brand Profit calculations for Protonix (and later generic pantoprazole) included the costs WWPI expended to manufacture the product, including direct labor, direct materials, and site overhead, along with the cost of the royalty and tableting fee paid to Nycomed.  (*Id.* at 119:22–120:5, 121:6–123:7, 160:12-17.)

4. After Wyeth calculated product-specific Direct Brand Profit, it later determined its Income Before Tax ("IBT") measure of profit.  Generally speaking, IBT equates to Direct Brand Profit, but then factoring in certain indirect expenses not directly related to a particular product.  (*Id.* at 127:18–128:14.)

6

5.      For financial accounting purposes, no Protonix profits were ever allocated to WWPI.  (*Id.* at 131:11-19, 147:19-22, 159:19–160:11.)

Plaintiffs' damages expert, Dr. Christopher Vellturo, bases his lost profits testimony on (*inter alia*) the amount of Protonix Direct Brand Profit that Wyeth would have earned in the "but for" infringement world, and will testify accordingly at trial.

## III. ANTICIPATED TESTIMONY FROM DEFENDANTS REGARDING TAX ALLOCATION ISSUE

Plaintiffs anticipate that Defendants will call Mr. Nelson and Dr. Brian Becker to testify regarding Wyeth's taxable profit allocations to WWPI.  However, based on Dr. Becker's expert report and Defendants' other testimony, Plaintiffs do not believe Dr. Becker will be able to establish a foundation that the profit allocations were for any reason other than tax purposes, and Mr. Nelson will not supply one either.

Dr. Becker's opening expert report focuses on a discussion of "transfer pricing" and the "arm's length" standard.  (*See generally* Ex. A [3/15/12 Becker Report].)  The "arm's length" standard is set forth in a tax regulation, 26 C.F.R. § 1.482-1, which is cited by Dr. Becker as the basis for the "arm's length" discussion that underlies his entire report.  (*Id.* at 15 & n.38.)  Dr. Becker notes the challenges

7

presented "from a tax standpoint" by the fact that Wyeth is taxed at the U.S. rate of 35% and WWPI is taxed at the Puerto Rico rate of 0-2%, and then states, "Transfer pricing regulations address this issue by utilizing a consistent standard that attempts to mimic market forces—generally known as the arm's length standard," after which he cites to the relevant tax regulation. (*See id.* at 15 & n.38.) Dr. Becker further writes:

> "Th[e arm's length] standard requires transfer prices between related corporate entities to be set at the level (in terms of price, fee, rate, etc.) that would have been achieved under hypothetically similar circumstances, but assuming that the trading parties had *not* been related to each other. Taxpayers must propose values for their transfer prices, but such values may be audited (and adjusted) by tax authorities before they are 'finalized.'"

(*Id.* at 15.) In other words, as Dr. Becker himself explains, the tax regulation requires an arm's length calculation that is "hypothetical" in that it treats related parties as if they are unrelated for the purpose of allocating income to the appropriate tax jurisdiction, and then the "tax authorities" may further audit and adjust such transfer prices even after the taxpayer has made its proposal.

Dr. Becker's entire report is focused on the tax implications of the transactions between Wyeth and WWPI. For example, Dr. Becker writes:

> "***For tax purposes***, it is often important to determine how much profit is earned by each entity within a corporation, because

8

> different corporations may be subject to different tax regimes. The WYETH GROUP's ability to book profit in subsidiaries operating in low tax jurisdictions like Puerto Rico, Ireland and Singapore allowed it to lower its tax burden than if it only reported profit in the United States."

(*Id.* at 12 (emphases added).)  Dr. Becker further writes:

> "These tax savings result from the fact that the separate corporate entities within a multinational enterprise are in fact legally separate entities.  In general, a multinational enterprise has to pay corporate income tax in the United States on income (*i.e.*, profits) earned by its U.S.-owned companies.  In general, however, it does not have to pay U.S. income tax on income earned by its foreign owned companies ….  Thus **for tax purposes**, it is necessary to compute IBT [Income Before Taxes] for *each* company within a multinational on its own.

(*Id.* at 12-13 (bold emphases added).)

In addition to Dr. Becker's own statements, the relevant tax regulation, § 1.482-1, makes it abundantly clear that the arm's length calculations that Dr. Becker discusses are solely for tax purposes.  As the regulation notes, "***In determining the true taxable income*** of a controlled taxpayer, the standard to be applied in every case is that of a taxpayer dealing at arm's length with an uncontrolled taxpayer."  26 C.F.R. § 1.482-1(b)(1) (emphasis added).  No case suggests that the proper measure of lost profits in a patent case is based on "taxable income," and in fact such arm's length calculations would not be done but for the tax code.

9

Moreover, regardless of the actual prices that the related parties charge during the relevant transactions, the tax regulations require application of the arm's length standard to then determine the appropriate profit split for tax purposes. *See* 26 C.F.R. § 1.482-1(b)(1) ("If necessary to reflect an arm's length result, a controlled taxpayer may report on a timely filed U.S. income tax return (including extensions) the results of its controlled transactions based upon prices different from those actually charged."). In other words, for tax purposes, the touchstone is determining what the hypothetical arm's length prices would have been between unrelated parties—even though the financial accounting for the actual transactions between related parties could have been very different.

Dr. Becker's expert report is also consistent with the trial testimony of Teva's Vice President of Finance and Controller, Jamie Berlanska, who testified:

> "I would also say clarify it is not for tax purposes. Tax profits may be different than book profits. So you said for tax purposes, so I'm just making a distinction that the difference between what a company records in its financial statements before taxes is different than what the taxes could be calculated based on."

(Ex. B [6/10/13 Rough Tr., Afternoon session], at 55:19–56:8.)

10

## IV. RELIEF SOUGHT

As Mr. Boardman has testified, Wyeth has always booked all revenues for third-party sales of Protonix, and has never allocated any profits to WWPI for purposes of financial accounting according to GAAP. Mr. Boardman has further testified that Direct Brand Profit is Wyeth's primary product-level measure of profitability, that it is calculated according to GAAP, and that it includes the costs of manufacturing Protonix (and Wyeth's OG) at WWPI. Mr. Boardman further testified that "tax entries" were later made but he is not the "tax expert."

Thus, at present, Defendants have elicited no testimony that any profit allocations to WWPI were for anything other than tax purposes. There is not yet any foundation for placing evidence concerning Wyeth's tax practices before the jury, and in light of Dr. Becker's report, Plaintiffs do not believe Defendants will be able to lay such a foundation. Plaintiffs therefore request that the Defendants be required to lay the necessary foundation before questioning any witness about the tax allocation. Furthermore, Plaintiffs request that the Court allow voir dire prior to either Mr. Nelson or Dr. Becker providing tax allocation testimony before the jury.

Dated:  June 11, 2013

Respectfully submitted,

*s/ Liza M. Walsh*

Liza M. Walsh
Hector D. Ruiz
Connell Foley LLP
85 Livingston Avenue
Roseland, NJ  07068

*Of Counsel:*

| | |
|---|---|
| William F. Lee | William G. McElwain |
| Wilmer Cutler Pickering | Amy K. Wigmore |
| Hale and Dorr LLP | Tracey C. Allen |
| 60 State Street | Perry A. Lange |
| Boston, MA 02109 | Deborah A. Yates |
| T (617) 526-6556 | Wilmer Cutler Pickering |
| F (617) 526-5000 | Hale and Dorr LLP |
| | 1875 Pennsylvania Avenue, NW |
| | Washington, DC  20006 |
| | T (202) 663-6000 |
| | F (202) 663-6363 |

*Attorneys for Plaintiffs*
*Altana Pharma AG and Wyeth*

12

ActiveUS 108557982v.4